H. L. Grigsby, Receiver, *et al. v.* The People's Bank, *et al.*\*

(*Nashville.* December Term, 1928.)

Opinion filed December 22, 1928.

---

\*As to power of bank to pledge assets to secure depositors, see annotation in 45 L. R. A. (N. S.), 950; 51 A. L. R., 296; 3 R. C. L., 419; 1 R. C. L. Supp., 822; 7 R. C. L. Supp., 89.

---

*Corpus Juris-Cyc References: Banks and Banking, 7CJ, section 232, p. 592, n. 70; section 326, p. 642, n. 2.

MAIDEN & ROWLETT, for appellees.

R. E. MAIDEN, for appellants.

MR. JUSTICE MCKINNEY delivered the opinion of the Court.

On September 1, 1927, the Peoples Bank, an institution engaged in the general banking business at Martin, Tennessee, being insolvent, ceased doing business, and by a proper proceeding it was placed in the hands of H. L. Grigsby, Receiver.

184

The bill in this cause was subsequently filed by the receiver against a number of the directors of said Bank, to recover notes of the Bank aggregating $6700, which had been pledged to said directors to secure and hold them harmless as a result of two bonds which they had executed as sureties for the Bank.

The first bond was for $15,000, and was executed in December, 1926, to secure the deposit of the Trustees of Weakley County in said Bank. The stockholders of the Bank, at its annual sessions in 1926 and 1927, authorized the pledging of the assets of the Bank to secure these sureties.

In May, 1927, while the Bank was a going institution, the Bank was anxious to secure a $30,000 deposit from the University of Tennessee, which was available upon the execution of a $40,000 bond. The defendants were asked to make this bond by the officer of the Bank, and agreed to do so, provided the Bank would pledge assets to secure them as sureties on this bond, as well as that given to the county trustee. As a result of this agreement, the notes referred to hereinabove were turned over to one of the defendants, as trustee.

The cause was heard upon a stipulation of facts in which it was agreed that the transaction was in good faith, entirely free from fraud; that the sureties received no personal benefit from the transaction, and that the sureties would not have executed said bonds but for the agreement of the Bank to indemnify them as heretofore stated. It was further stipulated that these deposits were desirable and of great benefit to the Bank.

The money thus deposited by the University was funds belonging to the State. *University of Tennessee* v. *Peoples Bank, et al.*, 6 S. W. (2 Series), 328.

The Trustee of Weakley County collects funds for the State as well as for the County. The trustee had on deposit in said bank about $2400 when it ceased to do business. It is not stipulated whether this fund belonged to the State or the County.

(1) By chapter 54, Acts of 1913, sections 285a1-285a6 of Shannon's Code, it is provided that any bank may become a public depository of money of the State by executing bond to secure such funds. This evinces a legislative intent to require security for State funds.

(2) The record presents a legal question which is determinative, and which may be thus stated. Can a State bank, engaged in the general banking business, pledge its assets to secure general depositors? Admittedly such power is neither expressly permitted nor denied. Is the right to pledge its assets in such circumstances an implied power?

The different kinds of deposits are thus defined in 7 Corpus Juris, under the title "Banks and Banking."

"No. 305. General Deposits. A general deposit which is the ordinary form is the payment of money into the bank to be repaid on demand, in whole or in part, as called for in any current money."

"No. 306. Special Deposits. A special deposit is a delivery of property, securities, or even money to the bank for the purpose of having the same safely kept and the identical thing deposited returned to the depositor."

"No. 307. Deposits for Specific Purposes. A deposit may be for a specific purpose, as where money or property is delivered to the bank for some particular designated purpose, as a note for collection, money to pay a particular note or draft, etc."

The following statements from Morse on Banks and Banking (6th Ed., 1928), vol. 1, are pertinent.

186

"The modern tendency is to liberal construction of corporate power to contract. The English decisions are clear that, *prima facie*, all its contracts are valid, and the burden is on the party objecting to show that the law by which it is created expressly or by necessary implication prohibits it; and the drift in the United States is in the same direction, away from the strict rule that held the power limited to that conferred or necessarily implied." (Page 175.)

"The ordinary relation existing between a bank and its customer, if not complicated by any further transaction than that of the depositing and withdrawing of moneys by the customer from time to time, is simply that of debtor and creditor at common law, whether the deposit is on demand or on time. The original and every subsequent deposit by the customer is in strict legal effect a loan by the customer to the bank, and *e converso* every payment by the bank to or on account of the customer is a repayment of the loans *pro tanto*." (Pages 665-667.)

"The cashier has inherent power to borrow money in the regular course of the business of the bank, and may secure the loan by note or pledge of the bank's property." (Page 441.)

"A bank has the power, without statutory authority, to transfer or assign any part of its assets as security for one or more of its depositors, or to secure a creditor who loans money to the bank." (Page 441, note 1.)

"A deposit, as a matter of law, is simply a loan by the customer to the bank of his money on the promise of the bank to repay, and a bank has the corporate power to borrow money and pledge its own securities as collateral for the loan. *Auten* v. *United States National Bank,* 174

U. S., 125, 43 L. Ed., 920, 19 Sup. Ct., 628.'' (Page 181, note 3.)

In the last-named case the court, speaking through Mr. Justice McKenna, said:

''Banking in much, if not in the greater part of its practice, is in strict sense borrowing, and we may well hesitate to condemn it as illegitimate, or regard it as out of the course of regular business, and hence suspicious and questionable. 'A bank,' says Morse (séc. 2, Banks and Banking), 'is an institution usually incorporated with power to issue its promissory notes intended to circulate as money (known as bank notes); or to receive the money of others on general deposit to form a joint fund that shall be used by the institution for its own benefit, for one or more of the purposes of making temporary loans and discounts; of dealing in notes, foreign and domestic, bills of exchange, coin, bullion, credits, and the remission of money; or with both these powers, and with the privilege in addition to these basic powers, of receiving special deposits and making collections for the holders of negotiable paper, if the institution sees fit to engage in such business.'

''This defines the functions: what relations are created by them? Manifestly those of debtor and creditor—the bank being as often one as the other.

''A banker, McLeod says, is a trader who buys money, or money and debts, by creating other debts, which he does with his credit—exchanging for a debt payable in the future one payable on demand. This, he says, is the essential definition of banking. 'The first business of a banker is not to lend money to others but to collect money from others.' McLeod, Banking, vol. 1 (2 Ed.), pp. 109, 110. And Gilbart defines a banker to be 'a deal-

188

er in capital, or more properly a dealer in money. He is an intermediate party between the borrower and the lender. He borrows of one party and lends to another.' Gilbart, Banking, vol. 1, p. 2.

"The very first banking in England was pure borrowing. It consisted in receiving money in exchange for which promissory notes were given payable to bearer on demand, and so essentially was this banking as then understood that the monopoly given to the Bank of England was secured by prohibiting any partnership of more than six persons 'to borrow, owe, or take up any sum or sums of money on their bills or notes payable at demand.' And it had effect until 1772 (about thirty years), when the monopoly was evaded by the introduction of the deposit system. The relations created are the same as those created by the issue of notes. In both a debt is created—the evidence only is different. In one case it is a credit on the banker's books; in the other his written promise to pay. In the one case he discharges it by paying the orders (checks) of his creditor; in the other by redeeming his promises. These are the only differences."

The latest decision upon this question to which our attention has been called is *Trust Co.* v. *Rose,* 192 N. C., 673. In that case certain officials of the bank executed a bond of $37,500 to secure the deposit of Richmond County. To indemnify these sureties the bank pledged to them notes aggregating about $38,000. Upon the failure of the bank the receiver brought suit to recover the notes, alleging that the pledging of the notes was an *ultra vires* act. In denying this contention the court said:

"The power of such corporation to so secure a creditor who loans money to the bank is well sustained by authori-

tative decisions of the courts; it does not seem to have been questioned. The relation between the bank and its depositor is that of debtor and creditor; we perceive no distinction on principle between one who deposits money with a bank, subject to check, and one who loans money to the bank for a definite time, as regards this question. There is no statute in this State forbidding a transfer or assignment by a bank of its property as security for one who is a depositor in the bank. Whether a sound policy forbids such transfer or assignment must be determined by the General Assembly and not by this Court.

"In the instant case the Bank of Hamlet, located and doing business in Richmond County, had express authority to protect funds of said county, deposited with it by the board of commissioners, by a bond, with either personal or corporate sureties. The bank has implied power, at least, to pay a reasonable premium to a corporation duly authorized to become surety on its bond; it must be held also that it has power, when required to do so, to protect personal sureties, by transfer or assignment, in good faith, of assets in value reasonable proportionate to the liability of such sureties, under the bond which is given to protect and thereby secure the deposits, such bond having been authorized and required by statute. The liabilities of the bank are not increased by such assignment and transfer; it has an asset in the deposit to offset its liability. Here the bank received a cash deposit of $37,500, and transferred and assigned, for the purpose of indemnifying the sureties on its bond, authorized by statute, its notes of the face value of $38,128.77. It is manifest that, as the parties to this controversy agree, the transaction was in good faith, and solely for the purpose of securing a desirable deposit for the bank. The trans-

fer and assignment was valid, if made by the bank, acting in its corporate capacity.

"The sureties upon the bond were officers of the bank, the transaction was conducted on the part of the bank by its vice-president and cashier, who was also one of the sureties, for whose protection the transfer and assignment was made. The contention that the transaction for this reason was invalid, cannot be sustained. It is agreed that defendants, although officers of the bank, had no personal interest in the transaction and received no personal benefit therefrom. Defendant, David Easterling, as vice-president and cashier, clearly had the power to receive the deposit and in good faith to act for the bank, without express authority from the board of directors, in complying with the lawful requirements of the board of commissioners. The board, as a depositor, is protected not only by the bond, and the obligation thereon of both the bank as principal, and defendants as sureties, but also by the notes transferred and assigned as security for the sureties. A creditor has an equity, which he may enforce, in securities deposited by his debtor with a surety to save the surety harmless by reason of his suretyship. To sustain the contention of plaintiffs would deprive the board of commissioners of additional protection upon which the board may have to rely for the recovery of the full amount of the deposit."

In concluding the opinion the court said:

"It would be a hard measure in view of changed conditions now to deprive defendants of the protection upon which they relied, in good faith, when, solely for the advantage of the bank, they assumed liability as its sureties. The bank, its creditors, depositors and stockholders, received all the benefits of the transaction; it is no

hardship to them to hold that defendants are protected by the security which the bank agreed to give and did give to them before they signed the bond. While it is justly held that officers and directors of a bank will not be permitted to gain personal profit or to secure personal advantage by reason of their official relations to the bank, power to serve the bank, its stockholders and depositors in good faith, without personal loss or discredit, must be conceded to them."

In *Williams* v. *Hall* (Ariz.), 249 Pac., 755, the court, in asserting the implied power of a bank to pledge its assets to secure general deposits, said:

"Nor do we think there is merit in the contention that the pledge of the securities was unauthorized by the bank. A deposit, as a matter of law, is simply a loan by the customer to the bank of his money on the promise of the bank to repay, and a bank has the corporate power to borrow money and pledge its own securities as collateral for the loan."

Other authorities supporting the right to pledge assets to secure deposits are *Ward* v. *Johnson*, 95 Ill., 215; *Richards* v. *Osceola Bank*, 79 Ia., 707; *McFerson* v. *National Surety Co.*, 72 Colo., 482; *Ahl* v. *Rhoads*, 84 Pa., 319; Bolles on Modern Law of Banking, 479; Pratt's Digest of National Banking Laws, 11.

In 51 A. L. R., 315, the annotator says:

"A provision of the banking law of Kansas (Laws 1911, chap. 65, No. 1) reads as follows: 'No bank, banker, or bank officer shall give preference to any depositor or creditor by pledging the assets of the bank as collateral security . . . provided, that any bank may borrow money for temporary purposes not to exceed in amount fifty per cent of its paid-up capital, and may pledge assets

of the bank not exceeding twenty per cent in excess of the amount borrowed, as collateral security therefor.' This provision, however, was construed in *Citizens State Bank v. First Nat. Bank* (1916), 98 Kan., 109, L. R. A., 1917A, 696, 157 Pac., 392, to apply only to a bank which is insolvent. The effect of this decision is that, even under the provision of the banking law quoted, a bank may, as long as it is solvent, pledge its assets to secure depositors.''

We have been referred to two cases taking a contrary view, *Divide County* v. *Baird* (N. D.), 51 A. L. R., 296, and *Commercial Bank & Trust Co.* v. *Citizens Trust & G. Co.* (Ky.), Ann. Cas., 1915C., 166.

In these cases a distinction was made between a deposit and a loan, based largely upon construction given to local statutes. It was also suggested that to permit the secret pledging of assets to secure favored depositors, of which no report is made to the public, might result in fraud and injustice to stockholders and unsecured depositors.

· *(3)* Our statutes, requiring periodical published statements of the condition of banks, makes it a serious offense to publish a false statement. · Shannon's Annotated Code, sections 2104-2104a. A true statement would include ''secured deposits,'' and it is the duty of the Banking Department of the State to require this in the form which it is authorized to provide for such statements. If this is done, we are unable to see how any hardship can result to unsecured depositors or stockholders further than would result where the bank borrowed a fund and pledged its assets as security. As pointed out in *Trust Co.* v. *Rose, supra,* the liabilities of the bank are not increased by the assignment since the deposit, which was beneficial to the bank, equals the assets pledged.

*(4)* In the instant cause it appears that this practice was only resorted to in order to secure valuable public deposits, which could not be obtained without security. It is a practice followed by many banks. We are unable to draw any substantial distinction between transactions where a bank borrows money for a specified time, or receives it on deposit for a stated period, or receives it on deposit subject to check. In either case the relationship is the same—debtor and creditor—the bank receives and uses the money of the creditor, to its profit, on a promise to repay.

As was stated in *Trust Co.* v. *Rose, supra,* it is for the legislature to say whether a sound public policy forbids such a transaction as this record presents.

The decree of the Chancellor granting complainant the relief sought will be reversed, and the bill will be dismissed.