[Civil No. 3162. Filed June 13, 1932.]

[11 Pac. (2d) 1085.]

JAMES B. BUTTON, Superintendent of Banks for the State of Arizona, in Charge of the Liquidation of the YUMA VALLEY BANK, a Corporation, Appellant, v. E. F. SANGUINETTI and BERT CAUDRY, Appellees.

330

Mr. R. N. Campbell and Mr. H. F. Colman, for Appellant.

Mr. William H. Westover, Messrs. Chalmers, Fennemore & Nairn and Mr. Henry W. Allen, for Appellees.

ROSS, J.—This is an action in replevin brought by the state superintendent of banks as receiver of the Yuma Valley Bank to recover from the defendants the possession of $178,834.03 worth of commercial paper and contracts claimed to be part of the assets, or bills receivable, of the said bank, unlawfully withheld by defendants from plaintiff. The answer was a general denial. The case was tried to the court without a jury, and resulted in a judgment in favor of defendants. Plaintiff has appealed.

The salient facts may be stated to be as follows: Prior to May 20, 1929, there was a bank in Yuma known as the Yuma National Bank. The officers and stockholders of this bank theretofore caused to be organized the Yuma Valley Bank, a state bank, for the purpose of taking over all of the assets of the Yuma National Bank and assuming all of its liabilities. This transaction was consummated on the 20th of May. The first board of directors of the new institution were the following: A. W. Crawford, John S. Cook, W. D. Fisk, Bert Caudry, C. H. Robertson, E. F. Sanguinetti, James L. Edwards, P. E. Blalack, and Leroy A. Wright. The day before the Yuma

Valley Bank opened its doors for business, to wit, May 19th, six of the nine directors and many other interested parties, were, from about 10 to 12 A. M., in the bank building, visiting and consulting concerning the new setup. Word was dropped from somewhere by someone that, unless the bank's cash reserve was increased so as to make a better showing, the deal would or might not go through. The committee in charge of making up a financial statement of the bank thought that it should start with a larger cash balance on hand than the figures showed by $150,000. The method proposed to raise this sum was that the members of the board of directors of the Yuma Valley Bank borrow the sum on their note from the Citizens' National Trust & Savings Bank of Los Angeles. Two of the officers of the Los Angeles bank were present looking after their bank's interests as a creditor of the Yuma National Bank, and the matter of the loan of $150,000 to the directors on their note was approved by these officers of the Los Angeles bank. Those who signed the note were Sanguinetti, Caudry, Crawford, Fisk and Cook. Sanguinetti did not want to sign it, but did so with the understanding and assurance of his codirectors or some of them who were present that, when the money was deposited in the Yuma Valley Bank, the latter would issue to him and his cosigners of the note a demand certificate of deposit and collateral it with bills receivable of the face value of twenty-five per cent. above the deposit, with the agreement that, if any of such bills receivable were paid or renewed, substitutions would be made. Plaintiff was present in his capacity of superintendent of banks for the state, and gave his approval of the arrangement before Sanguinetti would sign the note. The $150,000 was turned over to the bank and commingled with its general assets. The bank issued to Sanguinetti, Caudry, Crawford, Cook and Fisk a

certificate of deposit which they in turn assigned to the Los Angeles bank as collateral to their note.

When the plaintiff took the bank over as insolvent, it owed Sanguinetti and the others named the sum of $150,000. It had during the interim paid the interest on the note to the Citizens' National Trust & Savings Bank. The collateral which defendants claim had been promised them was not delivered until on or about April 29, 1930. On February 3, 1930, at a meeting of the board of directors of the Yuma Valley Bank, at which Fisk, Caudry, Ingraham (who had taken Blalack's place), Larkin and Cook were present, Crawford, Sanguinetti, Wright and Edwards absent, a resolution was passed directing the officers of the bank to deliver to Sanguinetti, Crawford, Fisk, Caudry and Cook ''promissory notes and/or other assets of the bank in amounts or sums representing such certificate of deposit plus twenty-five per cent. as allowed by law, for the purpose of securing such deposit or any like deposit,'' in accordance with ''the understanding (of May 19, 1929) that assets of the bank shall be available as collateral when it becomes necessary to repay the loan'' as represented by the certificate of deposit. Of those present at this meeting only Ingraham and Larkin voted for the resolution, Fisk, Caudry and Cook not voting. In pursuance of this resolution, the officers of the bank selected the paper pledged, or to be pledged, as collateral to the certificate of deposit, and it is this paper that the plaintiff, superintendent of banks and *ex-officio* receiver of the Yuma Valley Bank, is seeking to recover.

Present and participating in the arrangement whereby the $150,000 was to be raised to augment the bank's cash on hand when it opened for business were the president, two of the vice-presidents, the cashier, and the executive vice-president, the latter being the manager of the business and exercising the

duties generally pertaining to the cashier. These officers and the majority of the directors, not in regular meeting but by verbal conferences, agreed to the arrangement and that the certificate of deposit was to be collateraled with the assets of the bank.

The question is, Did the bank, or those representing it, have the power under the circumstances to pledge its bills receivable as collateral to the $150,000? In order to answer that question correctly, it is necessary to ascertain whether Sanguinetti and the others were depositors of the bank or lenders to the bank. If the former, we are satisfied under authority and reason the bank was without power, either express or implied, to make the pledge. But, if the transaction was in fact a loan to the bank by Sanguinetti and others, then the pledge was made with authority.

Our statutes require banks to give security for deposits of public money and make it the duty of officers who have the custody of public moneys to exact such security of public depositories (sections 2632–2645, Revised Code of 1928), but are silent as to private deposits. The Yuma Valley Bank was a commercial bank, which, under the statute (section 209, Revised Code of 1928), "means any bank authorized by law to receive deposits of money, deal in commercial paper, or to make loans thereon, to lend money on real or personal property, to discount bills, notes, or other commercial paper, and to buy and sell securities, gold and silver bullion or foreign currency or bills of exchange. . . . "

This language does not expressly nor impliedly authorize a bank to give security to depositors of private moneys, and the best reasoned cases hold that such power is not incidental nor essential to good banking practices. One of the latest cases discussing the point is *Smith* v. *Baltimore & Ohio R. Co.*, (D. C.) 48 Fed. (2d) 861. In this case the court takes up and analyzes both the state and federal

cases bearing on the question, and reaches the conclusion that the power to give security for general deposits "is not necessary to carry on the business of banking; it is not safe, and, therefore, it should not be implied."

In *Farmers' & Merchants' State Bank* v. *Consolidated School District,* 174 Minn. 286, 65 A. L. R. 1407, 1410, 219 N. W. 163, it is said public policy forbids a commercial bank from securing general deposits by pledges of its assets because "it is in derogation of that fair and equal treatment of all depositors, which is fundamental in the ethics of banking. A conclusive test is that no bank can make a practice of securing deposits by pledging assets and live. A few such transactions made known to its clientele would put any bank out of business. The practice would properly be taken to show that the institution was intrinsically so little deserving of deposits that resort to the too attractive lure of collateral was compelled by adverse circumstances. No bank could long survive such an exposé. The very offer of collateral for his deposit would send any discreet and informed depositor elsewhere. So, if the practice of securing deposits by pledge of assets is resorted to at all, it must be done secretly. That is enough to condemn it. Any power the exercise of which will not stand the light of publicity cannot be allowed to banks. The argument that a bank has, as an implied power, one that if used openly is ruinous and must be resorted to clandestinely if at all, refutes itself. Banks are intended above all else to be the dependable agents of thrift and commerce. To that end, express powers have been conferred on them. It would violate all rules of construction to construe into their implied powers one that would go so far to defeat the purpose of the express powers."

We think it is the general policy of our law that all private depositors should receive the same kind of protection, and that it was never intended that a state bank could, at its discretion, pledge its assets as security to deposits of one or more of its customers and not to the others. It is too apparent that such power could be wielded to prefer one depositor over others and defeat the just and equal distribution of the bank's assets among all its creditors.

There is a line of cases, however, taking the contrary view, but most of such cases have originated in controversies over public funds of the state or some political subdivision thereof. Perhaps the best considered case of the kind is that of *Grigsby* v. *People's Bank,* 158 Tenn. 182, 11 S. W. (2d) 673, which involved the power of the People's Bank to pledge its assets to secure its directors as sureties on its bond as a depository of the state's school money. The laws of the state required a bond of depositories of public moneys. Under such statute, it was held that the pledge of assets to secure such sureties was within the bank's powers and, we think, very properly so. Among the cases cited in the Grigsby case as holding that the bank has power to pledge its assets to secure general deposits is *Williams* v. *Hall,* 30 Ariz. 581, 249 Pac. 755. The facts in that case show that it involved public money of the state. Hall as secretary without statutory authority, had deposited in the bank, theretofore named as a public depository, funds of the state, instead of turning such funds over to the state treasurer, the proper custodian thereof, taking from the bank certain of its assets as security. In a contest between the receiver of the bank and the state, we held the latter was entitled to the assets so pledged to the secretary as against the receiver, on the ground of equitable estoppel. Having thus decided, we followed it up with this statement:

"Nor do we think there is merit in the contention that the pledge of the securities was unauthorized by the bank. A deposit, as a matter of law, is simply a loan by the customer to the bank of his money on the promise of the bank to repay, and a bank has the corporate power to borrow money and to pledge its own securities as collateral for the loan. *Auten* v. *U. S. Nat. Bank,* 174 U. S. 125, 43 L. Ed. 920, 927, 19 Sup. Ct. Rep. 628 [see, also, Rose's U. S. Notes]. And it is one of the ordinary powers of the president and cashier to borrow money in the regular course of business and pledge the bank's property, such as commercial paper, in payment of the debt. *Citizen's Bank* v. *Bank of Waddy's Receiver,* 126 Ky. 169, 128 Am. St. Rep. 282, 11 L. R. A. (N. S.) 598, 103 S. W. 249; 3 R. C. L. 450.''

. What we said in answer to "the contention that the pledge of the securities was unauthorized by the bank" and the cases cited as authority indicate very clearly that the point we intended to decide was that the proper officers of the bank could exercise its corporate power to borrow money and to pledge its securities as collateral for the loan. It was not necessary to a decision of the case, and we did not intend to be committed to the proposition that commercial banks of this state had the power to pledge their assets as security for general deposits. What we did decide, assuming such power to exist, was that it could be exercised by the officers of the bank, in whom such powers are generally vested.

We think the whole transaction conclusively shows that the $150,000 given by Sanguinetti and the others to the bank was not, and was not intended to be, a deposit, but was an outright loan to the bank. It was given over to the bank, and the bank issued therefor a demand certificate of deposit. It was not subject to be checked out; it could be withdrawn only upon a return of the certificate properly indorsed by the payees. That it was not intended to be

withdrawn is clearly evidenced by the fact that the payees of the certificate had indorsed. it over to the Los Angeles bank as collateral to their note for the $150,000 borrowed for the bank. The bank was a debtor for the $150,000, whether the account was a deposit or a loan. In either case it owed the $150,000 to Sanguinetti and the others. Whether the transaction amounted to a deposit or a loan is determined by other considerations than the debtor and creditor status. Bank deposits and bank borrowings in other respects are very different. As is said in *Schumacher* v. *Eastern Bank & Trust Co.*, (C. C. A.) 52 Fed. (2d) 925:

"A loan is primarily for the benefit of the bank; a deposit is primarily for the benefit of the depositor. A loan is not subject to check; a deposit ordinarily is. A loan usually arises from the necessities of the borrowing bank; a deposit, from the confidence of the depositor in its strength. A loan ordinarily is sought by the bank for its own purposes; a deposit is ordinarily made by the depositor for purposes of his own."

See, also, *Divide County* v. *Baird,* 55 N. D. 45, 51 A. L. R. 296, 212 N. W. 236; *Farmers' & Merchants' State Bank* v. *Consolidated School District, supra.*

It is the contention of the receiver that the pledge of the bills receivable as security to the loan was void because not authorized by the bank's board of directors. If it was necessary to have the official consent of the board of directors to the transaction to make it legal and binding, this contention we think is well taken. The resolution of February 3, 1930, directing the bank's officers to deliver collateral to Sanguinetti and the others in pursuance of the agreement and understanding of May 19, 1929, shows on its face that it was voted for by only two of the nine directors; it also shows that there was not a quorum of qualified directors present when the resolution

was passed. But the rule is well settled that the executive officers of a bank, in the usual course of business and without special authority, may rediscount the bank's paper or otherwise borrow money for its use. *Williams* v. *Hall, supra; Burrowes* v. *Nimocks,* (C. C. A.) 35 Fed. (2d) 152. The loan here was negotiated by the executive vice-president of the bank, who at the time was exercising the functions of the cashier, and it was he also who pledged, or agreed to pledge, the assets of the bank to secure the loan.

The receiver, without any evidence to support him, seems to assume that the officers and directors of the Yuma Valley Bank were profiting out of the loan made to the bank, and much of his argument is devoted to showing how the law will not permit or tolerate such a thing. If his premises were right, so would his conclusions be, but it is clear the defendants had no personal interest in the transaction and could receive no personal benefits therefrom. It is also clear that the defendants in borrowing the $150,000 and lending it to the bank did so in perfect good faith and solely for the advantage of the bank. The bank, its creditors, depositors and stockholders, received all the benefits of the transaction. It seems to us it would be rather a harsh and severe punishment, since the bank has failed, to deprive the defendants of the protection upon which they relied in good faith when they borrowed this money for the bank and compel them to suffer the whole loss.

It is evident that the loan was handled as it was because the officers and directors of the bank did not wish to show any additional bills payable in their financial statements. This we grant should not be encouraged. No banking institution should be permitted, much less encouraged, to disseminate any false or misleading information concerning its re-

sources and liabilities, or to suppress any fact that the public should know.

Under our banking laws (chapter 8, §§ 209–272, Rev. Code 1928), the superintendent of banks is given quite a little authority in the investigation and supervision of the banks of the state. Before a bank can hold itself out to do or transact any business, as such, it must secure from the superintendent of banks a permit (section 258). This officer, as the state's agent in banking matters, was present when the transaction pledging the assets of the bank for the loan was had, participated in it, was consulted as to its legality or regularity and gave his approval. It was only after his assurances that Sanguinetti agreed to sign the note to the Los Angeles bank and to turn over to the Yuma Valley Bank the money obtained thereon.

The only reason that can be found for not upholding the pledge of the collateral is the failure to show in the bank's statements that the liability for the $150,000 was secured. We think the bank and the receiver, who occupies the position of the bank, after obtaining the fruits of the loan, should not be permitted to shift the burdens thereof to Sanguinetti and the others, who unquestionably were acting in good faith and solely for the interests of the bank, and probably would not have made the loan except upon the assurances of the state superintendent of banks, whose words, no doubt, were accepted at their face value and as final.

The judgment of the lower court is affirmed.

McALISTER, C. J., and LOCKWOOD, J., concur.