Banking Commission, Appellant, vs. First Wisconsin National Bank of Milwaukee, Respondent: Pallange, Appellant. [Three cases.]

*December 8, 1939—March 12, 1940.*

62

64

*George A. Affeldt* of Milwaukee, attorney for the Banking Commission, and *William E. Burke* of Milwaukee, attorney for John G. Pallange, for the appellants.

For the respondent there were briefs by *Miller, Mack & Fairchild* and *Corrigan & Backus,* all of Milwaukee, attorneys, and *Nichols, Wood, Marx & Ginter* of Cincinnati, Ohio, of counsel, and oral argument by *Robert S. Marx, Edward M. Brown,* and *Frank E. Wood* of Cincinnati, Ohio, and *Paul R. Newcomb* and *W. D. Corrigan, Sr.,* of Milwaukee.

WICKHEM, J. The facts in this action are many and extremely complicated, and it is a matter of some difficulty to present them within the compass of a useful judicial opinion and at the same time to preserve a desirable degree of precision and accuracy. The trial of the case required seventy-three actual trial days, and involved examination of about eighty witnesses, and the introduction of over one thousand exhibits. There are over ten thousand pages of testimony. Before setting forth the material facts, it may be useful to state briefly the principal issues upon this appeal, so that the materiality of the facts as related will appear as they are read. The issues may thereafter be more precisely stated and considered together with such other issues as arise upon the record. The principal issues are : (1) Whether the great weight and clear preponderance of the evidence requires a conclusion that the First Wisconsin National Bank of Milwaukee, hereinafter called "National," in making certain loans to the Liberty State Bank, hereinafter called "Liberty," participated with the officers of Liberty in a scheme to manipulate the assets of the latter and to publish false statements of condition based upon the record of these transactions with the purpose and effect of deceiving the commissioner of banking, and depositors and creditors of Liberty. (2) If this question be answered in the negative, whether the great weight and clear preponderance of the evidence requires the conclusion that

officers of National knew of the unlawful purpose of the officers of Liberty in making the loans. The findings of the trial court constituted negative answers to both questions. (3) Assuming either (1) or (2) to be established, what legal consequences are to be visited upon National? Since the issues upon this appeal are very much narrower than the issues at the commencement of and during the trial, it is necessary to set forth here more facts than have a precise bearing upon the issues to be disposed of upon this appeal.

Liberty was a state bank, organized in 1921, and closed by resolution of its board of directors on July 18, 1932. On the date of its closing it was indebted to National in the sum of $583,300 for money loaned to it and used in the normal and usual course of its banking business. This indebtedness was evidenced by promissory notes in the sums, respectively, of $402,000, $50,000, $39,300, $5,000, $65,000, and $22,000. As collateral for this indebtedness National had in its possession assets of Liberty of the face value of $1,136,753.55. After Liberty closed, its books, records, and assets were taken over by the commissioner of banking, and the bank was liquidated by his deputies. During the period intervening between the taking of possession by the commissioner of banking and the institution of action by the Banking Commission in August, 1935, the status of National's claim as a validly secured claim was recognized by the commission and by a creditors' committee which was organized subsequent to the closing of the bank. During this period both the commissioner, the commission (which was created by ch. 374, Laws of 1933, to succeed the commissioner), and the creditors' committee from time to time joined in petitions to the circuit court representing that National's claim was valid, and requesting authorization for application of collateral to its payment. Fourteen petitions were so filed and in each instance an order was made granting the petition. As a consequence, National liquidated such portion of the collateral as was

necessary completely to pay the indebtedness of Liberty, and returned to Liberty surplus collateral of an aggregate face value of $547,777.65. In 1935, the commission came to the conclusion that its concession of the validity of National's claim had been improvident and commenced one of the three actions here involved. Since the pleadings of the commission adequately set forth its position, a summary of its amended complaint will satisfactorily disclose the issues proposed at the outset of this litigation.

The complaint alleges that one I. J. Rosenberg, ever since the organization of Liberty, had been its president, a member of its board, and in the active charge and management of its business; that one Ray Tiegs was its cashier, and in the transactions involved acted under the domination of Rosenberg; that Rosenberg had no experience in banking matters and advised with the officers of National in regard to the affairs and business of Liberty; that Liberty cleared through National, and at various times borrowed money from it; that the relations between the two banks were close and confidential, and that National at all times had complete and intimate knowledge of the condition of Liberty; that at the times involved one Kasten was president and George T. Campbell vice-president of National, and as such officers had authority to and did make loans to numerous banks and bankers in the state of Wisconsin which loans were from time to time approved by the financial and executive committees and board of directors; that all the loans made to Rosenberg and to Liberty were made by officers of National with full authority and were approved by the financial and executive committees and the board of directors; that commencing in 1929 banks and trust companies in Wisconsin and in the United States generally were severely affected by the depression and compelled to maintain their liquidity in order to satisfy demands of depositors, and the value of stocks, bonds, and other securities and property had depreciated and their conversion

into cash had become increasingly difficult; by reason of this, banks were required to collect loans and resort to means to secure cash with which to operate; that to assist numerous banks and trust companies within the state, National, during the period beginning 1930 and ending July 1, 1932, loaned sums in excess of $20,000,000 to these institutions; that in June, 1931, Liberty was in such condition that an orderly liquidation for the protection of depositors and creditors might become necessary, which condition was known to the officers of National; that at or about this time Rosenberg consulted with officers of National in regard to the then condition of Liberty and set forth and disclosed fully its condition; that Rosenberg then contemplated the voluntary closing and liquidation of Liberty and the conversion of its assets into cash for payment of depositors and creditors, and that he communicated this intention to National; that such closing and liquidation to National's knowledge would tend to increase the alarm and uneasiness of depositors in banks including National and those with which it was affiliated; that to prevent these consequences National offered to loan Liberty money from time to time as required, secured by the pledge to National of assets of Liberty; that if Liberty had then been liquidated, its assets would have been equally and rateably distributed and paid to all depositors and creditors of the bank, and that depositors and creditors who thereafter and prior to the close of the bank withdrew their deposits would not have received payment in full to the prejudice of those who remained depositors and creditors until the close of the bank in reliance upon reports of its condition published as heretofore alleged; that in the latter part of June, 1931, Rosenberg and officers of National anticipated that a call would be made by the commissioner of banking to report to the commissioner the true condition as of that day of all Wisconsin banks and to publish a statement of this condition in a newspaper as required by law; that at this time Liberty was indebted to National in the sum of $320,000 upon

promissory notes executed to evidence the loans; that if Liberty had filed a true, correct, and accurate statement of its then condition, and caused the same to be published, depositors and creditors would have discovered that deposits, loans, and discounts of the bank were decreasing, that borrowings of the bank were excessive and increasing, and that its liquidity was diminishing and its ability to pay depositors impaired; further, that if such report was made to the commissioner of banking and published, there would be a run upon the bank resulting in its closing; that to avoid these consequences "and for the purpose of concealing from such depositors and creditors and persons who might deal with said state bank the true and actual condition thereof and the amount of indebtedness of said bank to said defendant as by it claimed for bills payable, and for the further purpose of lulling such depositors, creditors and persons into a false feeling of security as to their deposits in said bank, and to avert the hereinbefore-mentioned financial disturbances and losses to said defendant and the other banks in which said Bankshares was interested by reason of stock holdings or loans, theretofore made, and for other reasons," National "entered into a scheme with said Rosenberg pursuant to which said defendant agreed to loan to said Rosenberg, personally, a large sum of money shortly before each respective call day which sum was . . . to be deposited to the credit of said state bank in a checking account by it maintained in and with the said defendant, on which said account it was arranged that, immediately after each credit, a check should be drawn by said Rosenberg, or the cashier of said state bank, payable to the order of said defendant for the amount of each such loan respectively, which said check was to be delivered to and accepted by said defendant as payment on account of the indebtedness of said bank then claimed by said defendant to exist on account of loans theretofore by said defendant claimed to have been made to said state bank, so that Rosenberg would, in the statement of the financial condition of said state bank to be

filed with said commissioner of banking pursuant to each call, and published as required by law, be able to set forth the amount of bills payable of said bank at the amount to which the same would be reduced by the payments." It is further alleged that it was arranged by National and Rosenberg that immediately after each such call the loan made to Rosenberg should be canceled and the amount thereof charged to the said bank, thus restoring the *status quo;* that to keep the statement of the state bank in balance it was arranged that Rosenberg should on each such occasion withdraw and ostensibly purchase certain securities of Liberty equal in par value to the amount of each loan; that pursuant to this arrangement and scheme a loan was made to Rosenberg on June 29, 1931, in the sum of $205,850; that Rosenberg ostensibly purchased and withdrew securities of the Liberty bank to that amount pursuant to an agreement made with the cashier of Liberty whereby Liberty ostensibly agreed to repurchase these securities within a few days after their withdrawal; that these securities were delivered to National as collateral to the loan by Rosenberg, held until after the call day, and shortly thereafter redelivered to Rosenberg, his loan canceled, and the obligation of Liberty to National restored; that thereafter Rosenberg, as president, and Tiegs, as cashier, of Liberty prepared a statement of its financial condition setting forth that its bills payable amounted to $114,150, and filed this with the commissioner of banking and published the statement in the newspapers in the city of Milwaukee, as required by law; that during the period of this transaction National held collateral of Liberty of the face value of $459,100 to secure the loans amounting to $330,000 which existed at the beginning of the transaction; that upon the payment and discharge of the indebtedness of the state bank in the amount of $205,850 by this transaction there was by virtue of the provisions of sec. 221.33, Stats., released from the pledge and lien of defendant the proportional amount of collateral

held for this loan; that none of the collateral was released, and that this was a violation of the terms of the pledge. Allegations of the sort heretofore detailed are repeated with respect to a loan in September, 1931, on which date it was anticipated that another call for statement of condition would shortly be forthcoming; it is alleged that by that time the amount of Liberty's bills payable was $408,422.10, and that a similar arrangement was made with National whereby $206,225 was borrowed under an arrangement whereby Rosenberg ostensibly withdrew securities having this face value, signed a note for this amount, had it credited upon Liberty's debt to National, and Rosenberg executed a repurchase agreement dated September 25, 1931, whereby he agreed to repurchase the Liberty's securities on or before fifteen days from date. Statements showing the bills payable reduced by this amount were sent to the commissioner of banking and published. In December, 1931, another call for statement of condition was due and at that time the bills payable of Liberty amounted to $461,300. It is alleged that again arrangements were made for the temporary reduction of such bills payable over the call day. By that time National had in its possession as collateral to Liberty's obligations to it securities amounting to $717,558.85, none of which were released when the loan reducing bills payable was made. It is alleged that on December 30, 1931, this transaction was repeated, the amount of the temporary loan or rediscount being $210,020; that on March 23, 1932, another such transaction took place, the amount involved being $280,000; that the anticipated call did not materialize, and this transaction was canceled and reversed on or about the first day of April. Another call was anticipated about June 20, 1932, at which time bills payable to National bank amounted to $431,300. The collateral pledged amounted to $789,192.35. The transaction was repeated, the amount involved being $271,117.35. On this occasion reports were made to the examiner and pub-

lished in such manner as to show the bills payable reduced by the sum borrowed.

Summarizing these allegations, they amount to this : That in its own interests and that of its associated banks, National initiated and entered into a plan to keep Liberty open although it should properly have been liquidated; that in pursuance of such plan National participated in a scheme with Liberty to make ostensible and temporary rediscounts of portions of Liberty's assets over the call dates in order to create the appearance that Liberty's bills payable were less than they were in fact, the purpose being to deceive and lull into security depositors and creditors by indicating a more favorable condition of Liberty than the facts warranted; that in each of the five instances the transaction was not only canceled within a few days after the time of call but that it was made in anticipation of the call, and by the terms of the repurchase agreement it was contemplated that the arrangement would only subsist until the call day had been passed and the statements of condition were made and published. It is alleged that the cashier and president of Liberty acted without consent, approval, or authority of Liberty or its directors and were wholly without power to consummate the transaction. The complaint further alleges that loans made by National to Liberty after the 18th day of June, 1932, were to its knowledge being used to pay Liberty's depositors ; that this defendant continued to make these loans and wrongfully exacted excessive and unlawful amounts of collateral, thus diminishing the assets of Liberty; that on July 18, 1932, the date of closing the bank, defendant had in its possession assets of Liberty to the amount of $1,136,733.55; that the deposit liability as of that date was $780,252.32; that there remained in possession of Liberty assets amounting to $572,472, of which only $30,224.64 was cash and amounts due from other banks, and the rest was largely furniture, fixtures, building, real estate, and other minor items having a large book value

but very little actual value; that the amounts exacted by National were virtually all of the liquid and valuable assets of Liberty; that by reason of the foregoing National is estopped to assert that the charges made by it against Liberty and the notes obtained from Rosenberg in the five instances heretofore referred to were valid and subsisting indebtednesses of Liberty, and is estopped from claiming any lien upon collateral held by it in order to secure the payment of these notes. The full knowledge and assent of officers and directors, and financial and executive committees of defendant to the transaction complained of is alleged, and it is claimed that the commission on behalf of the stockholders, depositors, and creditors of the bank is entitled for the general purposes of liquidation to all moneys realized and collected upon any of the bonds, notes, and securities by National since the close of Liberty.

The second cause of action alleges that in 1924 National advised the cashier of Liberty that the officers of Liberty had no general power to make loans on behalf of the bank or pledge assets of the bank, and that authority from the board of directors was necessary; that National furnished a form of resolution to be used by Liberty's board of directors; that the resolution last adopted preceding the transaction specifically mentioned was in the form furnished by National and was adopted by the board of directors in the meeting of April 14, 1931, at which time Liberty owed National the sum of $200,000. On information and belief, it is alleged that on March 8, 1932, the board of directors, for the declared purpose of obtaining a loan for temporary purposes, authorized a loan to be negotiated in the sum of $425,000. There follow allegations of like authorizations on July 18, 1932, for $525,000, for $575,000, and for $585,000, respectively; that these are all of the authorizations given to the president and cashier by the board of directors from and after April 14, 1931, until the bank closed, to borrow money

and pledge collateral; that each of the notes involved in the five transactions stated in the first cause of action were wholly unauthorized; that as each of these notes was given and the proceeds applied on existing indebtedness evidenced by notes, canceled notes were returned to the Liberty bank, but corresponding collateral was never surrendered, as was required by statute; and that in consequence of these facts National had and has no claim to collateral which it has liquidated and applied to its indebtedness.

For a third cause of action it is alleged that to close each of the five transactions about which this controversy centers, checks were given by Liberty the aggregate of which was sufficient to pay, and should be considered to have paid, all of the valid indebtedness incurred by Liberty to National and claimed by the latter to be owing at the time of the close of Liberty. As a consequence, it is asserted that the commission is entitled to a surrender of or accounting for all of the securities which had been pledged with National as collateral.

A fourth cause of action alleges a preference in violation of sec. 221.33, Stats. A fifth cause of action anticipates the defense of estoppel based upon the commission's earlier approval of the Liberty claim by alleging that at the time of this approval it had no knowledge of the facts upon which its present cause of action is based. The cross complaint of Pallange alleges in slightly different form the same facts as are set forth in the complaint of the commission.

For evidence that National initiated a scheme to keep Liberty open when it should have been closed and liquidated, that a plan so to manipulate the assets over successive call dates as to deceive creditors, depositors, and the commission, was devised by National as an adjunct to this main purpose, together with evidence that Mr. Rosenberg, president of Liberty, was inexperienced in banking, that his relations with National were confidential, and that National had intimate knowledge of the financial condition of Liberty, the commis-

sion relied wholly upon testimony given by Mr. I. J. Rosenberg. At the close of the case the commission repudiated Mr. Rosenberg as a witness, and the trial court considered that his testimony was not worthy of belief. No contention is made in appellant's brief that any conclusions ought to be based upon the testimony of Mr. Rosenberg, and there has been no attempt to recede from the repudiation of his testimonial credibility made upon the trial. In view of this, we do not feel justified in adding to what must necessarily be a long and complicated opinion a detailed analysis of the respects in which the testimony of the witness was so impeached as to warrant the views entertained concerning it by the parties and the trial court. It suffices to state that in our opinion appellant's concession was not improvident and the court's conclusions with respect to the credibility of this witness were well warranted. With the elimination of Rosenberg's testimony, there drops from the case all evidence that National was the initiator or moving spirit in a scheme to keep Liberty open for its own benefit either by exorbitant but genuine loans or by ostensible loans designed so to manipulate the assets and liabilities as to deceive the commissioner, the creditors, and the depositors by false statements of condition based thereon. It must be concluded that the scheme, whatever its scope, was initiated by Mr. Rosenberg, and appellants must depend upon the testimony of Mr. Tiegs, the cashier of Liberty, Mr. Kasten, president of National, and Mr. Campbell, vice-president of National, as well as such inferences as are required to be drawn from conceded facts, to establish that National knew or participated in a scheme by Rosenberg to manipulate the assets and liabilities of Liberty and to publish false statements based thereon.

The trial court filed one hundred forty-nine findings of fact and fourteen conclusions of law. It is unnecessary here to do more than state that the court found that there was no such knowledge and participation by National as is charged

by appellants. Of the forty-eight assignments of error by appellants, forty-one are directed to findings or parts of findings addressed to the issue of knowledge and participation, and are to the effect that these findings are contrary to the great weight and clear preponderance of the evidence. In this situation, we proceed to a review of the testimony and the circumstances which are now relied upon to upset these findings of the trial court.

Tiegs, cashier of Liberty, who actively participated in the transactions questioned, testified that he handled all of the details under Rosenberg's direction. He gave no direct evidence tending to indicate that National or its officers or employees had any knowledge of or participation in any illegal purposes. He stated that the papers were prepared at Liberty, and the reports made and published by employees of Liberty under his supervision. He testified that Campbell on one or two occasions expressed his distaste for the transactions. The testimonial evidence upon which it is most seriously contended that National knew or participated in a scheme to create a false or colorable setup and to publish false reports is that of Mr. Campbell, vice-president of National, in charge of bank loans, who handled the transactions for National.

Mr. Campbell testified that he was in charge of the banks and bankers division of National; that in that capacity he had charge of the deposits of country banks and made bank loans; that he had power to make loans up to $10,000 without further authority; that he could make loans up to $50,000 with the joint authority of one of the executive vice-presidents or the president of the bank; that with the same authority he could make collateralized loans for almost any amount, subject to confirmation by the financial committee of the bank either before or after the loan was made; that he had known Rosenberg for fifteen or twenty years and knew him to be the president of Liberty and in active charge

of management of the bank; and that on the occasion of the loan of $205,850 on June 29, 1931, referred to in the complaint as the first transaction, his conferences were with Mr. Rosenberg, and the first conversation was a week or two before June 29th. On that occasion Mr. Rosenberg indicated that he would like to borrow as much as $150,000, and Campbell asked him what he was going to use the money for. Rosenberg explained that he was going to take some of the slow assets out of the bank and put in cash. Campbell testified that he probably knew that a call was anticipated for statements of condition as of the 29th or 30th of June. He testified that Mr. Rosenberg indicated that he was taking some notes out of the files of Liberty and wished to borrow some money on them until he was in a position to sell some securities and take them over. He did not believe that Rosenberg said anything about reducing bills payable over the call day or that anything was said in the preliminary negotiations concerning a repurchase agreement. He took up the matter with Mr. Kasten before the loan was consummated, and Mr. Kasten told him that if the loan were properly collateralized, it would be satisfactory because Rosenberg had considerable personal responsibility. He stated that there was some talk between him and Kasten relative to getting a legal opinion whether a bank could sell any of its assets without authority of the board of directors, and that an opinion upon this point was obtained. He did not submit to counsel any questions concerning a repurchase agreement, and he first saw the document when it was delivered by Liberty by Mr. Tiegs. National had loaned money before on notes indorsed without recourse, but Campbell did not recall any transactions except the ones involved in this case where a repurchase agreement had been involved. He did not believe that there was any talk about a repurchase agreement until it was brought down with the collateral. He had a second conference with Mr. Kasten, but does not know whether

he had the repurchase agreement with him at that time. He did, however, know that the notes covered by the agreement were to be taken back within the time fixed unless cash was put in to take their place. Rosenberg said that he was going to sell some securities and take over these notes. Credit was given for these notes to the account of Liberty. He had not formed any idea at the time he had taken the repurchase agreement in the first transaction to Kasten's office that Rosenberg had no intention of taking out any paper of the Liberty bank, but "I knew that in the final analysis that he did not have any intention of taking this out." He stated that the repurchase agreement was for the protection of National; that they were taking in collateral in the form of customers' notes amounting to $205,850 without complete statements on all of them, and that the repurchase agreement furnished some assurance that they were protected to the amount of the face value of the notes and loan, although he had gone over the notes with Tiegs and it looked to him as if all the makers were responsible. He was asked whether he "knew that the purpose of this repurchase agreement was that within a few days after this transaction of June 29, 1931, the Liberty State Bank was to take back some securities." His answer was, "It may be possible." The same answer was made to the question whether he knew that the situation was to be reversed within a short time. He realized after Liberty had borrowed additional money and paid back the loan of Rosenberg that the loan was temporary. When Liberty brought to National a note for the purpose of reversing the transaction, the credit for the proceeds of the note was made according to Liberty's instructions. The transactions were all accomplished by credit, as is customary with bank transactions. His attention being called to the records, he testified that while he thought there was a note issued by Rosenberg to the bank on June 29, 1931, evidently there was not a note but that the repurchase agreement was

treated as a demand obligation of Rosenberg. In his talks with Rosenberg prior to June, 1931, the latter said that he wanted to "reduce the bills payable of the Liberty on his statement, but he would show liability in some other form. Rosenberg said he wanted to assume some of the liability on his bills payable; naturally that would reduce his bills payable, but would show the balance of debt in some other form." Campbell knew that four times a year Liberty had to make a report and "that his first transaction was in anticipation of the call for statements that was expected as of June 30, 1931." The witness did not believe that he had any talk with Rosenberg with respect to having the notes indorsed without recourse. He knew that the transaction was to show bills payable of Liberty over a call day in different form; that this was done at the request of Rosenberg; that the entire liability would be in the statements but it would not appear under the heading "bills payable." The liability would be shown through the repurchase agreement, and the bank statements have a column for that. In the John Doe proceedings Campbell testified that he "knows now" what the purpose of the transaction was, but that he did not give this a thought at the time of the transactions. He testified that he did not remember this testimony. He also was asked on John Doe proceedings what Rosenberg wanted the loan for, and he answered, "I can tell you what he wanted it for, so he would not show that much bills payable over a statement call." He stated that he knew that a statement on call meant a statement of the condition of Liberty to be filed in the office of the commissioner of banking and published in the newspapers. He knew there were two forms of statements but was not familiar with the form they have in the banking department. He made a study of one of the forms after Liberty closed, but before that he did not know that the statement for filing with the Banking Commission had schedules not contained on the form used for publication.

He did not know that a repurchase agreement would not be shown on the statements that were to be published in the newspapers.

Campbell acknowledged that on or about July 25, 1931, a letter from Liberty inclosing a copy of its published statement of condition crossed his desk and was initialed by him. He stated that he could not say that he had looked at the inclosure, and that while possibly he did, he did not examine it; that he received a number of such statements every day and these went right up to the credit department. He does not recall that the statement was sent to him for any particular purpose. Such statements came to his department because he was head of the banks and bankers division. He does not believe that he looked at the statement to see what it showed with respect to the items of bills payable, but he is not positive. (At another point he says that he would say that he did look at the statement to see what it showed with respect to bills payable.) During the years 1931 and 1932 he may have referred to the credit department for information about Liberty but he does not remember. He was asked whether it was not a fact that the transaction of June 29, 1931, was for the purpose of helping Liberty over a statement call to show less bills payable. His answer was that it would not show less bills payable but two indebtednesses. The question being repeated, Campbell answered with this question: "You mean to make a false statement?" He was then asked, "To make a statement showing bills payable less than they actually were?" The answer was: "It would show bills payable less than they actually were, but would show some other form of indebtedness if the proper statement was made." Asked if these transactions were for the purpose of window dressing, Campbell testified that he had stated to the grand jury that the loan of June 29, 1931, was used for this purpose, and that his bank knew this; that the transaction just transferred temporarily on paper part of Liberty's liability to Rosenberg. After conceding that he made these an-

swers before the grand jury, he stated that these answers were true at the time they were made according to his definition of "window dressing." He defined "window dressing" as a term used by various banking departments relating to a call statement where a bank shows a portion of its outside debt picture in some form other than bills payable. "But they have got to show the true assets and true liabilities of the bank as of that date." This might be shown in bills payable, rediscounts, or sales of securities on a repurchase agreement, or sale of assets on a repurchase agreement. Place for entry of such items as liabilities is provided in the form of statement to the commissioner of banking that existed in 1931 and 1932. In his opinion there is no object in "window dressing" because if the liabilities are added they amount to the same thing—bills payable. If men with responsibility want to assume a part of the liability of a bank it might be of some advantage. That is, the statement indicates this degree of interest in the bank by one of its officers or directors. Campbell did not know at that time that the published statement of the condition of state banks was not as complete as that filed with the commissioner of banking. Although he had on numerous occasions examined bank statements as published, he had not observed the difference between the two forms of statement until after the closing of Liberty. He stated that a false statement may be made by taking out the same amount of assets on one side and the same amount of liabilities on the other. Although such a statement will balance, it will not be a true statement. On the other hand, if the rediscounts or repurchase agreements are listed as liabilities, there will be a true statement of the bank's condition.

The collateral supporting the repurchase agreement in the transaction of June 29, 1931, was not sent to the collateral department but remained in the discount department to be handled as a total of notes or as one note. In September, Campbell knew that another call was anticipated but did not

give it a great deal of thought. He had a talk with Rosenberg before this loan and Rosenberg said he wanted some money. He does not remember any conversation concerning the call statement. Rosenberg said at that time that he was going to take out some slow paper in the bank. Campbell knew at that time that Rosenberg had not carried out this purpose in the June and July transactions; that Rosenberg explained that he had not put money into the bank by sale of securities because the securities had declined and he did not want to take a loss at that time, but that he was good for the loan and that he wanted to reduce the bills payable over the statement call. Campbell expected that he would put money into Liberty. The transactions occurred just before call days because Rosenberg wanted to assume part of the responsibility for the bills payable of the bank over the call day. He does not think there was any talk in September about a repurchase agreement, but there was a repurchase agreement. The bank did not suggest the repurchase agreement in June. He thinks he mentioned the transaction to Kasten at this time, but is not sure what he told Kasten. The records of the loans, however, passed over Mr. Kasten's desk. He did not draw the repurchase agreement involved in this transaction although the paper bears the watermark of National. Toward the end of 1931 he talked to Rosenberg about not having taken out the slow paper from Liberty as he had indicated he would, and Rosenberg excused himself by stating that he did not want to take a loss on the sale of some of his securities. On October 6, 1931, he did not give any thought to whether a call had been made or not. He does not remember his conversation with Rosenberg at that time. In this transaction securities were used which were already in the possession of National as collateral for existing obligations. On January 5, 1932, he realized that Rosenberg had not placed his money at the disposal of Liberty and when he called this fact to Rosenberg's attention

he received the same answer as on previous occasions. He knew that this transaction was a transaction over the call date. Campbell considered that Rosenberg had offered a good explanation as to why he had not supported his bank earlier, and expected him ultimately to do so when the security market was better. He did not recall any particular talk with Rosenberg about the March, 1932, call. He thinks there was no note from Rosenberg in the September transaction but that the repurchase agreement was treated as a note. His recollection about these matters is not very specific. He thinks that he must have reminded Rosenberg that he had not taken out the slow paper as anticipated and received the explanation given on previous occasions. When the June 30th transaction came up, Campbell knew that a call was imminent. On this occasion he suspected that the transaction would be more or less permanent and he told Tiegs to contact Rosenberg and tell him to support his note with some of the securities he was going to sell, that the bank would keep the note and renew it from time to time, and he could dispose of securities and reduce it. He stated that when the June 30th transaction came in with a due date July 1st he would like to have believed that Rosenberg intended to take care of slow paper and sell securities. This transaction was supported by notes already held as collateral by National. He talked to Kasten a number of times about these transactions but does not remember using the term "window dressing" in his talk. He does not believe he ever saw a printed statement of the Liberty bank until after the bank closed.

Mr. Kasten, president of National, was confronted with his testimony on adverse examination and before the grand jury. Upon his adverse examination he had stated that he saw Rosenberg no oftener than two or three times a year, and also testified that Rosenberg had been in to see him many times to try to sell his bank to National. Before the grand jury he had stated that Rosenberg had been in to see

him frequently to sell his bank, and that he told him the first thing to do was to get his bills payable down so that he would not have "such a big picture" to look at; that he had too many loans for the size of his deposits. On his adverse examination he denied that he had ever made such a statement to Rosenberg, and stated that he had never discussed with the latter the question of bills payable. He stated that he does not remember having testified to the contrary before the grand jury. Generally speaking, he claimed to have no recollection of the details of the loans or what he did or said or conferred about at the times they were made. He did not think that the financial committee gave any consideration to the fact that these transactions occurred at or about the time of calls for statements. He denied that for a long time prior to the June transaction he was working with Rosenberg to get him to reduce his loans. On the occasion of one of these loans he did say something about getting a legal opinion. He remembers nothing else that Campbell told him about the loan. He does not recollect that he knew that the transaction was for the purpose of enabling Rosenberg to make a better-looking statement. It did not enter his head at any time that any of the five transactions had any connection with bills payable. So far as he could remember Rosenberg never told him of his intentions to take out slow assets. He thinks that Campbell told him that Rosenberg had stated this to him. He testified that he remembered practically nothing about the transactions and that he was not keeping any particular check upon the condition of Liberty. He did not check their published statements. He testified that Campbell did not tell him that Rosenberg wanted to make the loan for "window dressing" purposes. He presumes he would know that they were to reduce bills payable. He did not remember testifying before the grand jury that he discussed Rosenberg's loans with Campbell and that Campbell said that Rosenberg wanted to borrow some money and that he was

"window dressing" by relieving the bank of bills payable and that he told Campbell to get a legal opinion before bringing the matter to the committee. He stated that he never had heard the term "window dressing" until after the close of Liberty. When he did hear it, he did not suppose that "window dressing" meant dressing up a statement so as not to reflect the true picture of a bank's condition. On adverse examination he had said that "window dressing" has a fairly well-defined meaning and refers to a statement dressed up in such a way as not to reflect the true picture of the bank's condition. Before the grand jury he stated that he knew about the Liberty loan made in June, 1932, and he states that he does not remember that it was this transaction he discussed with Campbell. Before the grand jury he stated that he *knows* as a matter of fact that these loans were made at the time call statements would be forthcoming. To the question, "What did that mean to you?" he answered, "It only meant he was trying to get himself in better shape up there for the published statement." Question, "By reducing the bills payable of his bank and putting it on his own personal liability?" Answer, "Yes, and he had to publish that." He stated that these questions and answers did not refresh his recollection and that he did not remember the following testimony before the grand jury: "They were made for the purpose of 'window dressing,' weren't they?" Answer, "You may call it that." Question, "No; I am not a banker." Answer, "I would say that is what he did it for." (Respondent claims that this testimony referred to Kasten's views at the time of giving the testimony as to what Rosenberg intended and not to his views at the time of the loan.) He also testified, "You knew that, didn't you?" And he said, "No. I knew he was borrowing money . . . not for the purpose of 'window dressing' but with the promise he was going to sell securities or collect loans to put his bank in better shape." He was asked concerning his testimony before the grand

jury denying that Rosenberg had told him that the loan was to make a better showing on the call statement and the *status quo* would be restored after the filing of the statement. He denies any recollection of this testimony.

The testimony of Campbell and Kasten is not always clear and definite, or consistent with itself or with what was said by the same witness on adverse examination or before the grand jury, but this simply goes to its weight. Kasten's testimony, so far as that offered upon this trial, is virtually a complete denial of all knowledge of the transactions or of any detailed recollection of them. His testimony on adverse examination or before the grand jury is open to the construction that he knew that the purpose of these loans was to enable Liberty to reduce bills payable over a call date pending Rosenberg's ability to put money into the bank and take out slow paper; that Campbell knew that these were temporary loans over the call date; that the purpose was to reduce bills payable by the assumption on Rosenberg's part of an obligation which would ultimately be met by Rosenberg through the sale of his own securities and the use of the proceeds to permanently take over Liberty's slow paper. So far as Campbell is concerned, his evidence is open to the construction that while he regarded this as a species of window dressing, he assumed from what he knew about the forms required by the commissioner of banking that this transaction would show up as a separate liability of Liberty and that there would be no tendency to deceive anyone capable of reading a bank statement; that he did not realize that the published statements as distinguished from those sent to the commissioner of banking would not list this as a liability, but would merely be published in such a way as to show diminished assets on one side and diminished liabilities in the form of bills payable on the other. Such a statement, he concedes, would give a false impression of the condition of the bank and would constitute a false statement. He denies having any contemplation that such was the purpose, or of intention-

ally or knowingly participating in such a purpose. Standing alone and without taking into account other circumstances of the transaction hereinafter to be considered, the foregoing testimony is sufficient qualitatively and quantitatively to warrant the finding of the trial court that National neither knew nor participated in a scheme, plan, or transaction having for its purpose or object the publishing of false statements of condition concerning Liberty. We discover nothing in the testimony that would require the trial court to reject it as incredible, and we deem it unnecessary to consider whether the trial court could reasonably have come to other conclusions of fact upon the basis of it. Such a determination, if made, would only demonstrate the existence of an issue of fact, the resolution of which by the trial court would be final.

The testimony of members of the directors and the financial committees of National consists of flat denials that they had the slightest notion what the transaction was about. They claimed that they simply considered the sufficiency of the collateral and the responsibility of Rosenberg, and that the loan was considered at meetings in which many other loans were discussed and passed. There is no reason to conclude that the trial court could not accept this testimony on its face value in view of the volume of business transacted and the fact that none of the committee were personally involved in any of the negotiations.

The next question is whether the fact that these five transactions occurred on successive call dates, that they involved the first repurchase agreements ever received by National, that they were reversed in each instance a few days after the call date, together with other circumstances hereinafter to be detailed, rendered the transactions so extraordinary and so out of the usual course of business that knowledge of their purpose must necessarily have been brought home to Campbell and Kasten. In this connection the routine of the loans made by National to Liberty should be stated.

As of June 28, 1931, Liberty owed National $320,000 as heretofore set forth. Excluding the five transactions in question, but including the $320,000, there was advanced to Liberty and unpaid at the time of its close the sum of $583,300. All of the moneys so loaned ($1,056,300 loaned, $473,000 repaid) were concededly temporary loans and were used in the business of Liberty. Injected into this picture are the five transactions with which we are here concerned, each of the five loans being made and repaid within a few days. A brief statement of the details of each of these transactions follows: In the June, 1931, transaction, Tiegs selected notes and discounts at random aggregating $205,850, affixed thereto indorsement of Liberty without recourse, prepared a list of such notes of the maker and amount of each, and delivered the notes, discounts, and list to National. A repurchase agreement was signed by Rosenberg addressed to National by the terms of which in consideration for the purchase of these notes from Liberty Rosenberg agreed to repurchase them on or before July 10th. This agreement contains on its back a list of the notes. Upon delivery of this document and the collateral to National, National prepared a credit ticket for bills discounted for Liberty and credited the face value to Liberty's checking account. At the same time, without any check or writing from Liberty, National prepared a debit ticket charging the checking account with $206,626.40, and credited this to the bills-payable account of Liberty. Notes upon which payments in full were credited were stamped "paid" and returned to Liberty. The balance was indorsed as a part payment upon a $40,000 note of Liberty. There is some conflict whether Rosenberg executed a note to National, but the trial court found that he did and we do not deem this finding to be against the great weight and clear preponderance of the evidence. On its discount journal National listed as payer not Rosenberg but "various customers' notes indorsed without recourse." The

credit ticket prepared by National crediting Liberty's checking account refers to the item as demand paper. To replace the charge by National against Liberty's checking account, Tiegs sent a check corresponding in amount to the debit ticket. Entries made on Liberty's books were on the basis of the credit and debit tickets. In closing the transaction Tiegs prepared a note of Liberty for $205,850, the exact amount by which the bills payable had theretofore been reduced and delivered this note to National. National prepared a credit ticket for the amount of the note and credited the checking account of Liberty, at the same time preparing a debit ticket charging the checking account with the same amount plus interest and crediting the amount of $205,850 to Rosenberg on its liability ledger of Rosenberg's account, offsetting the charge made against him on June 29th. The amount of the note was entered on National's liability ledger against Liberty's account as a charge restoring the bills payable to $320,000, the same amount as existed before June 29th.

The other transactions need not be dealt with in detail. The method heretofore described was carried out generally with some variations. For example, in the September, 1931, transaction, the repurchase agreement purports to obligate Rosenberg, in consideration of the purchase of various notes by National from him, to repurchase such notes. The former repurchase agreement stated the consideration to be the purchase of the notes by National from Liberty. In the December, 1931, loan and all those following, no notes were taken to National, the notes involved being securities already in National's possession as collateral for other debts. In the December loan the peculiarity was that Tiegs prepared a demand note of Liberty for the sum involved and delivered this to National together with an indorsement of the note to National without recourse by Liberty. Affixed thereto was a guaranty of payment by Rosenberg. The anomalous character of this instrument is, of course, obvious since the maker

signed also as an anomalous indorser without recourse and an outside party appears on the paper as guarantor. This was charged on the books of National as a direct obligation of Rosenberg. After making the entries Campbell discovered that the note was not in proper form and Tiegs prepared a new note for the same amount in which the name of I. J. Rosenberg was inserted as payee. For the March transaction, Tiegs prepared the following documents : (1) List of notes equal in face value of the amount of the loan; (2) a letter to National requesting it without recourse to pay to the order of I. J. Rosenberg the attached list of notes and securities; (3) a note by Rosenberg for $280,000, payable to National on demand; (4) an authorization by Tiegs to National to credit the sum involved representing Rosenberg's note to the credit of Liberty, and a letter of the same date whereby Liberty agreed to repurchase the note of Rosenberg. The last transaction, that of June, 1932, is about the same as that just described, except that Liberty purported to sell without recourse the notes and securities in question to Rosenberg and agreed to repurchase them from him.

The sum of $583,300, which was the balance claimed by National at the time Liberty closed, is to the extent of $402,000 based on a note of Liberty dated July 5, 1932, in that principal sum, and this is claimed to include the sum of $271,117.35, the amount which National on July 1, 1932, charged against Liberty to restore the bills payable to the amount to which the same had been reduced by the fifth loan.

The question is whether the form which the transactions took together with all of the surrounding circumstances are such as to require the inference that the officers of National in spite of their oral denials knew of the unlawful purpose of Liberty and participated in a scheme to further it. The contention is that considering the form of the transactions and their recurrence over five successive call dates in connection with the experience and skill as bankers of Kasten and

Campbell, the conclusion cannot reasonably be avoided that these officers knew and participated in the scheme to its fullest extent. See *Federal Mortgage Co. v. Simes,* 210 Wis. 139, 245 N. W. 169; *Price v. Herreid,* 210 Wis. 422, 245 N. W. 689. The circumstances from which it is claimed this inference is inevitable are many and complicated.

A detailed examination *seriatim* of each circumstance with the inferences that may or must be drawn therefrom would unduly extend this opinion without contributing to clarity. We shall, therefore, group the important circumstances in accordance with the inferences to which they are claimed to be subject and by consideration of each group seek to ascertain, (a) what conclusions of fact are so inevitable that a finding to the contrary would be against the great weight and clear preponderance of the evidence, and (b) whether such inferences render incredible oral evidence to the contrary offered by respondent. The first group of circumstances may be disposed of by the statement that they all tend strongly to indicate knowledge on the part of the officers of National that the five transactions in question were temporary loans over a call date. The officers of National knew the requirements of the state law with respect to statements of condition. They knew that the amount of bills payable is a significant and important indication of a bank's condition. They knew that each of the loans was made immediately prior to an anticipated call date and repaid within a few days thereafter. In the first two transactions the notes involved in the repurchase agreements were kept in the discount department because the transaction had some of the aspects of a discount and was soon to be terminated. Other details of the transactions, which it is not considered necessary to set forth here, likewise require the conclusion that it was well understood by the officers of National that these transactions constituted temporary loans over a call date. This conclusion is not in conflict with Campbell's testimony, and the

trial court was not required to draw other inferences less favorable to respondents from the facts above stated.

As repudiating Campbell's testimony that he supposed that these transactions were to enable Rosenberg to take slow assets out of Liberty and to substitute his own money, it is pointed out by appellants first, that National in every instance credited the proceeds of these transactions to Liberty, and, second, that as each succeeding transaction took place, the officers of National could not possibly have been ignorant of the fact that former transactions had been completely closed within a few days, and there could be no ground for a belief that Rosenberg was purchasing slow assets and putting his own money into Liberty. We think it perfectly clear from the evidence that Campbell could not and did not suppose that these very transactions constituted the taking of slow paper out of Liberty or the investment by Rosenberg of his own funds in substitution therefor. What he did understand was that these were temporary transactions over the call date by which Rosenberg assumed a liability for a portion of the bills payable of Liberty, thus enabling Liberty to list its liabilities partly in bills payable and partly in rediscounts until such time as Rosenberg would be in a position to liquidate his own securities without sacrifice after which he proposed to put his own money permanently into Liberty in substitution for its slow assets. There never was any possible doubt as to the fact that the transactions were for the benefit of Liberty and consequently nothing extraordinary about the circumstance that the proceeds were credited to Liberty. The strongest inference that can be drawn against National is the fact that Campbell continued to accept Rosenberg's assurances that he would ultimately sell securities and put money into Liberty. In view of Rosenberg's wealth, and the undoubted state of the security market, we consider that the court could properly accept Campbell's explanation. Even if it were otherwise, the most that could be concluded is

that Campbell should have known that the reason assigned for the transaction was not the true one. This is far from affecting him or National with knowledge of or participation in an unlawful enterprise.

As discrediting Campbell's testimony that he supposed that the transaction would be reported in statements of condition as a liability although not as bills payable, it is asserted that no liability of Liberty could show up in any statement of condition unless the indorsement without recourse and the repurchase agreement were colorable and sham because the appearance of the transaction was that Liberty had no liability to National whatever. This circumstance shows nothing more than is otherwise perfectly evident—that Campbell understood that Rosenberg was to sustain the only personal liability and that this was to be collateralized by notes of Liberty and further secured by a repurchase agreement. This is consistent with the testimony of Campbell that he supposed the transaction was one which would be reported as a liability to the commissioner of banking, whatever its form. In the report required to be returned to the Banking Commission, banks were required to report as liabilities rediscounts without recourse but with a guarantee or indorsement of officers and directors of the bank and also amounts borrowed upon pledge of the bank's assets in the names of officers or directors or on whose loans the bank pays interest. In neither of these transactions so required to be reported as liabilities is the bank in form a debtor. Hence, this circumstance does no more than indicate that the officers of National knew or should have known that these transactions were for the purpose of putting bills payable into a different form but one which had been treated as a liability by the banking commissioner and which was required to be reported as such.

As establishing that this was a merely colorable or formal transaction, the following circumstances are relied upon by

appellant : (1) The maximum amount which National at any time prior to these occasions loaned to Rosenberg personally was $20,000. In view of the evidence of Rosenberg's wealth and financial responsibility, this circumstance does not impress us as furthering the contention that the transaction was colorable. Had Rosenberg been without financial responsibility the circumstance might have greater importance. (2) No money was involved in any of the transactions but they were simply credits and debits represented by bookkeeping entries. No inferences of any importance can be founded upon this routine. The usual course of business upon a bank loan is to credit the account of the borrowing customer and respond to checks. The routine involved here constitutes no departure from the usual course of banking. Old notes were surrendered, credits were entered upon remaining notes for the balance of the amount borrowed, interest was charged and collected, and the normal routine fully carried out with the possible exception that the securities were not transferred to the collateral department but remained in the discount department and receipts were not issued for the securities involved. The first procedure was because of the fact that the transaction involved a discount, and the second is accounted for by the fact that the securities were listed on the back of the repurchase agreement. (3) These were the only transactions of their kind in which National had ever participated and were so unusual as to challenge attention. The circumstance is not important. The position of National would not have been improved had the repurchase agreement been omitted and the temporary character of the transaction appeared solely from the short term of a note given by Rosenberg. The repurchase agreement did not cloak or change the fact that this was a loan, and its temporary character would have been indicated whatever form the loan took by the due date of any instrument used to accomplish it. (4) Promiscuous notes receivable to the number of more than one hundred used in the first two

transactions were credited in spite of the difficult conditions of bank credit then obtaining at full face value to Liberty's checking account without investigation as to value. This fact is urged as being so out of the usual course of business under all the circumstances as to indicate that this was not a *bona fide* banking transaction but simply an agreement to create the appearance of a transaction over the call date. The trial court could well find that the temporary character of the agreement, the repurchase arrangement, and the undoubted financial responsibility of Rosenberg, were sufficient to warrant a loan on the basis of securities which had received only a cursory examination.

As indicating conclusively that Campbell knew of the purpose to publish false statements, appellant points out that which has heretofore been set forth, to wit, that a few weeks after the first of these transactions a copy of the published statement of Liberty's condition came to Campbell's desk and was initialed by him, and that while his testimony is not consistent on the point, he at one point testified that he had examined it to see what it showed with respect to bills payable and noticed that they had been reduced. Further than this, it is conceded that published statements of condition of Liberty were in the files of National. While this testimony could be argued to support a finding, had the trial court made it, that Campbell knew that Rosenberg was publishing false statements predicated upon the transaction in question, the trial court was not compelled to adopt this view. Campbell testified that he examined more or less perfunctorily a great many statements that came in to him, initialed them, and sent them to the credit department. He testified that he did not at any time discover the false element in the published statement until after Liberty closed. The trial court could properly accept this explanation.

In connection with the claim that Campbell knew of a purpose to publish false reports, it is asserted that the transactions could not be truly reported to the commissioner of

banking in the special columns provided in the form of report. The June, September, and December items constituting the first three transactions were reported under the heading, "Amount of bills receivable rediscounted for bank without recourse but with guaranty or indorsement of officers and directors." The June, 1932, transaction was reported under the heading, "Amount borrowed upon pledge of banks assets in the names of officers or directors or on whose loans bank pays interest." Appellants assert with respect to the report of the first three transactions that this constituted a false statement for the reason that it contained no indication that Liberty had any liability whatever on the rediscounted bills receivable, whereas the fact was exactly opposite. This is really contrary to the contention just considered and presumably was intended to be considered as an alternative. The contention is not sound. The heading of the form required rediscounts without recourse to be reported as bank liabilities although in form the only liability was the personal guaranty of an officer. The purpose of inserting this column into the statement was to require that all such transactions, although not in form liabilities of the bank, be shown as liabilities in order that such devices for reducing the amount of bills payable would not mislead the commission. It is not important to consider whether Liberty was or was not indebted as a result of the transactions because at all events the transactions were reported to the commission as liabilities. Hence, we do not think that this circumstance fixed upon Campbell any knowledge of a purpose on the part of Rosenberg and Tiegs to issue false statements.

In examining the foregoing circumstances we have simply considered whether they demonstrate that the findings are against the great weight and clear preponderance of the evidence. We deem it unnecessary to consider whether they give rise to reasonable inferences favorable to appellant because to find this would only be to discover an issue of fact

for the court. Considering the evidence as a whole, we conclude that the trial court was warranted in holding, (1) that National did not initiate, suggest, or instigate the transactions or in fact have any concern other than that of making a provident loan; (2) that National had no knowledge of any purpose by Liberty to predicate false statements of condition upon the transactions or to publish these statements; (3) that this unlawful purpose formed no part of the inducement or consideration for these loans and was not a condition of them; (4) that the transactions were not formal or colorable from the standpoint of National but were in fact genuine loans. Since the allegations involve fraudulent or criminal acts, the burden of proof was upon appellants to establish them by clear and satisfactory preponderance of the evidence. *Poertner v. Poertner,* 66 Wis. 644, 29 N. W. 386; *Maldaner v. Smith,* 102 Wis. 30, 78 N. W. 140; *Trzebietowski v. Jereski,* 159 Wis. 190, 149 N. W. 743; *Oberleitner v. Security Ins. Co.* 199 Wis. 220, 225 N. W. 735; *Maahs v. Schultz,* 207 Wis. 624, 242 N. W. 195; *Humbird Cheese Co. v. Fristad,* 208 Wis. 283, 242 N. W. 158; *Bruins v. Brandon Canning Co.* 216 Wis. 387, 257 N. W. 35. Hence, to warrant its findings, the trial court was not required to be satisfied that National did not participate in an illegal transaction or know of its illegal purpose. It was enough if the trial court was unconvinced to the requisite degree that it did so know and participate. Thus, its findings are not so much affirmative or positive findings of want of knowledge and participation as an indication that the trial court was not satisfied to the requisite degree of the existence of such facts. In declining affirmatively to find knowledge, the trial court was entitled to consider the fact that the transactions were not instigated by National, the volume of business done by that bank, the testimony that bank statements coming to the attention of bank officials were more or less perfunctorily looked at, and Campbell's explanation that he assumed that

the liabilities would be set up on the published statement in the same way as they were required to be set up in reports to the commissioner of banking, and his assumption that in such a form these would not constitute false reports. The court was justified in accepting the explanation of Campbell that he supposed that Rosenberg would eventually liquidate his own securities and put the proceeds in the bank in substitution for slow assets, and that the transactions were temporary loans until the securities could be sold without undue sacrifice. The court was not required to conclude that the transactions were purely colorable from the standpoint of National. Existing notes were canceled and interest was charged and collected. The short term of the loan cannot of itself be argued to conclusively indicate a purely formal transaction. It does not increase the force of the inferences to call the transactions "manipulations" or to refer to the payment of the loan as the reversal of the transaction. We shall not labor this point, however, for the reason that in seeking to prove this a wholly colorable transaction, not only on the part of Rosenberg but on the part of the bank, it seems to us that appellants prove too much. If successful in this argument, appellants are faced with the fact that the only loan transactions which remain are those genuine and enforceable and fully authorized loans to the amount of $583,300, no part of which has ever been paid or discharged. This conclusion would not improve appellants' position. The most favorable position for appellants is that this was a loan to Rosenberg for the benefit of Liberty; that it was made for the purpose of concealing the amount of Liberty's bills payable and founding upon this concealment a false publication of condition to the misleading of creditors and depositors of the bank; and that since the officers of National after the first transaction must have known the purpose, the other loans were not merely made with knowledge but with a purpose of participating in or promoting the ille-

gal ends sought by the officers of Liberty. We conclude that in so far as appellants' case depends upon knowledge on the part of National of a purpose on the part of Liberty to publish false statements predicated upon the transactions in question or to engage or participate for some undisclosed purpose in a purely formal or colorable transaction designed to have no legal effect, it must fail for the reason that the findings of the trial court are supported by evidence.

It remains to be considered, however, what the trial court was required to find concerning this transaction and to consider what legal consequences flow from these facts. We are of the view that the evidence establishes beyond question that National knew that these were temporary loans over a call date and that they were for the purpose of reducing bills payable and showing this liability in a different form. We are also of the view that the evidence requires the conclusion that National knew and understood that the transactions involved repurchase agreements and that the latter constituted an inducement to, condition of, and consideration for the transactions in question. We are not cited to any authority holding that a bank may not change the form of its assets and liabilities provided it properly reports these changes and we have discovered no authority to the effect that it may not do this in anticipation of a call for condition. Perhaps this is a field in which there should be some regulation which does not presently exist. Perhaps, on the other hand, regulation of such practices other than by requirements that they be properly reported, is impractical. That the practice is recognized as lawful if properly reported is indicated by the blanks for reports to the Banking Commission. The danger of misleading officials and depositors by transactions which leave the bank with no appearance of liability is recognized by requiring all of these to be reported as liabilities of the bank. So long as they are so reported they can do no harm, and it is difficult to see how they can accomplish anything be-

cause anybody who can read a bank statement and who knows enough about banks to be concerned at the amount of bills payable will easily locate these rediscount transactions and give them their proper significance. However little may be said for the practice, we are unable to discover any authority to the effect that it is unlawful, and it cannot be said that knowledge by a lender of such a purpose in making a loan constitutes knowledge of an illegal purpose. Even if it did, the authorities unanimously hold in bank-loan cases that such knowledge does not constitute the lender a participant in an unlawful contract so long as the illegal feature was not a condition or did not form a part of the consideration of the contract. Here it did not. National was wholly indifferent to the purpose of the loan so long as it was a provident one.

The leading case upon the subject is *Hanover Nat. Bank v. First Nat. Bank* (8th Cir.), 109 Fed. 421. In that case the Hanover bank at the request of the president of the Kansas bank discounted notes for the Kansas bank. They were informed that the president of the Kansas bank did not wish to state the bank's indebtedness on account of these notes in reports to the comptroller of the treasury and therefore the transaction was carried out in the name of the president and not of the borrowing bank. Funds were advanced and were used by the Kansas bank, and on its liquidation one of the defenses was that this was an illegal contract because the Hanover bank knew that the form which it took was adapted to conceal the condition of the Kansas bank from the comptroller of the treasury. The court held that this was not a good defense. The illegal purpose was not a consideration or condition of the loan. The consideration was the discount and interest, and the loaning bank had no particular concern with the purpose of the transaction. The law which the president of the Kansas bank violated contained specified penalties for violation and such a consequence as was urged was not one of them. The obligation to report was purely

statutory and the failure to report was a failure of a statutory and not a moral obligation.

This case has been consistently followed. *Button v. Sanguinetti* (1932), 40 Ariz. 329, 11 Pac. (2d) 1085; *Kendrick State Bank v. First Nat. Bank* (D. C. 1913), 206 Fed. 940; *Leonard v. State Exchange Bank* (8th Cir. 1916), 236 Fed. 316; *Cherry v. City Nat. Bank* (8th Cir. 1906), 144 Fed. 587; *Rankin v. City Nat. Bank* (1908), 208 U. S. 541, 28 Sup. Ct. 346, 52 L. Ed. 610; *Schumacher v. Eastern Bank & Trust Co.* (4th Cir. 1931), 52 Fed. (2d) 925; *State v. Capital City Bank* (1927), 32 N. M. 369, 257 Pac. 993; *Keyes v. First Nat. Bank* (D. C. 1927), 20 Fed. (2d) 678. Hence, it is our conclusion that even had the National known of the purpose to issue false statements as a result of the loans in question, that would constitute no defense to Liberty in this transaction.

The proceeds of these loans were used to discharge existing and lawfully contracted indebtedness of Liberty, and we see no way to avoid the application of this universally accepted rule. The law is quite as concerned with the rights of one group of bank depositors and creditors as it is with another. No matter how this matter is put, the fact is inescapable that Liberty had used and never repaid $583,300 of the funds of National and that National has collected this amount by liquidation of collateral deposited to secure its claims. If the transactions be held colorable, the clearly valid debts remain unimpaired. If treated as a genuine and lawful transaction, no part of the notes in National's hands at the time Liberty closed are tainted with illegality. If the transactions were illegal in purpose, mere knowledge of that purpose would not preclude a recovery by National if the proceeds were used by Liberty in its business because knowledge of the illegal purpose would not constitute participation. And even if participation had been found, it is open to serious question whether, in view of the fact that the securi-

ties have been liquidated and the debt paid with full consent of all the parties including the commission, in accordance with orders of the circuit court, the transaction is not so fully executed as to be beyond the reach of any person standing in the shoes of the Liberty bank. Nothing that has occurred has diminished the assets of Liberty. A holding that National must surrender the proceeds of securities already applied to the payment of its balances would constitute the imposition of a penalty wholly apart from and outside of the transaction upon which the penalty is based. It would simply mean that the penalty against the lending bank would be measured not by the amount involved in the transaction itself but by the amount which happened to be otherwise owed, and that this penalty would go to the benefit of all of the depositors of the borrowing bank and not to those who may have been prejudiced by the transaction. This the authorities do not authorize nor do we discover a principle upon which it may be justified.

Appellants contend that under the circumstances of this case National is estopped to claim that the liabilities of Liberty to it are any greater than the amount of bills payable as reduced by the last transaction involved in this case. The theory of this contention is that the last transaction created upon the books of Liberty the appearance that its bills payable were only $157,000. The cases principally relied on to support this position are *Schwenker v. Teasdale,* 206 Wis. 275, 239 N. W. 434, and *Deitrick v. Greaney,* 309 U. S. 190, 60 Sup. Ct. 480, 84 L. Ed. —. In the *Schwenker Case* defendant, for the purpose of increasing the apparent assets of the bank, made a note payable to the bank without consideration and with the understanding that it was not to be enforced. This court held that, having created this appearance, defendant was estopped from asserting that the note was not intended as an obligation or that it had no consideration. In the *Deitrick Case, supra,* the note sued upon was given to

the bank by one of its directors as a substitute among the bank's assets for shares of its own stock illegally purchased by the bank. It was given with the understanding that the bank was to retain its interest in the stock and that the note was not to be paid. In holding defendant liable the court said that "the doctrine . . . is not strictly that of estoppel. . . . It is a principle which derives its force from the circumstances that the respondent's act, apart from its possible injurious consequences to creditors, is itself a violation of the statute; and that the statute, read in the light of its purposes and policy, precludes resort to the very acts which it condemns, as the means of thwarting those purposes." We consider the doctrine of these cases inapplicable to the facts of this case. Because of the findings of nonparticipation by National in the violation of the statute relating to publication of reports of condition (sec. 221.15, Stats. 1931), the foundation for the doctrine is missing. A mere finding of knowledge of the illegal purpose would not be sufficient. It is to be observed that neither the *Schwenker* nor *Deitrick Cases, supra,* involved bank loans. In each an individual gave his note to a bank for the purpose of creating an apparent asset and with a secret understanding that the note was not to be enforced. The rule applicable to bank loans is stated in the *Hanover Case, supra,* is generally followed, and appears to us to be sound. To apply the doctrine of the *Schwenker* and *Deitrick Cases, supra,* to cases of bank loans where there was knowledge by the lending bank of an unlawful purpose on the part of the borrowing bank, but where the proceeds were actually used in the business of the latter, would constitute a repudiation of the bank-loan cases.

It is next contended that the transactions involved repurchase agreements by Liberty, that such agreements are against public policy and unenforceable, that whatever is true of the other features of the transaction the repurchase agreement was a condition or inducement to the transaction, and

that National participated in such illegality as is involved therein. In the first two transactions this contention cannot apply because in those the repurchase agreement was executed by Rosenberg. In the third transaction it is doubtful whether a repurchase agreement was used at all, and at any rate it was not established that it was executed by Liberty. In the March, 1932, transaction Liberty, by Tiegs, cashier, did execute a repurchase agreement by the terms of which it agreed to repurchase Rosenberg's note from National. The June, 1932, transaction likewise involved an agreement by Liberty to repurchase the notes used as securities in that transaction.

The principal cases relied on by appellants are *Awotin v. Atlas Exchange National Bank*, 295 U. S. 209, 55 Sup. Ct. 674, 79 L. Ed. 1393; *Rothschild v. Manufacturers Trust Co.* 279 N. Y. 355, 18 N. E. (2d) 527; and *Hawkins Realty Co. v. Hawkins State Bank*, 205 Wis. 406, 236 N. W. 657. The *Awotin Case, supra*, involved a construction of sec. 5136, U. S. R. S., as amended by a proviso in 1927, to the effect that the business of buying and selling investment securities should thereafter be limited "to buying and selling without recourse market obligations known as investment securities." It was held that this amendment precluded a national bank from accompanying a sale of investment securities with an undertaking to repurchase them at par upon maturity. It was held that the purpose of the proviso was to prevent national banks from undertaking contingent liabilities in connection with the sale in investment securities, and that a repurchase agreement amounted to a guarantee of the securities themselves. In consequence of this construction, it declined to enforce the repurchase agreement involved in that case. The *Rothschild Case, supra*, was an action by plaintiff to recover damages for failure of the defendant bank to repurchase from him at their full purchase price certain stocks and bonds bought by him from the bank. The cause

of action was based upon an oral repurchase agreement made to induce plaintiff to purchase securities from the bank. It was claimed that the bank promised to repurchase the securities on demand at any time during the lifetime of the securities at the price paid by plaintiff. The court held that this agreement was contrary to public policy and unenforceable. The reason assigned was that the sale of the securities apparently increased the liquid assets of the bank and created the appearance that the bank had fully disposed of the securities for cash or good commercial paper. If the repurchase agreement were upheld, it would mean that the bank after this transaction was burdened with an undisclosed contingent liability incapable of being measured in advance, and that neither the depositors nor public officials could determine the stability of a bank which had outstanding any considerable number of these agreements. In the *Hawkins Case, supra,* the cashier of a bank in connection with a purchase from the bank of a number of real-estate mortgages in consideration for the surrender of a certificate of deposit agreed to repurchase the mortgages "at face plus interest accrued." This agreement was held to be void as against public policy in an action for damages by reason of the failure of the bank to carry out the repurchase agreement.

These cases are not in point. The *Awotin Case, supra,* of course, simply construes a federal statute putting limitations upon the powers of national banks. Both the *Awotin* and *Rothschild Cases, supra,* deal with the sale of investment securities accompanied by a repurchase agreement that virtually amounts to a guarantee of the securities or a guarantee that the purchaser will suffer no loss by the transaction. The *Hawkins Case, supra,* involved the sale of mortgages from the bank's portfolio with a repurchase agreement having the same effect. It is one thing to hold that in selling securities a bank must not assume such a contingent liability. The reasons for this are well put in the *Rothschild Case, supra.*

It is quite another thing to hold that a bank may not in connection with a secured loan, (1) guarantee the securities by which the loan is collateralized or, (2) what amounts to the same thing, agree to repurchase the collateral at par, or (3) agree to repurchase a note given on its behalf by another as a means of raising money for it. In these situations the repurchase agreement constitutes all or a part of the security for the loan. In such cases the limits of the bank's liability are established by the amount of the loan. There is no contingency which will increase the burdens of a borrowing bank that are not present in any loan transaction involving collateral. If the collateral diminishes in value and is later liquidated to meet the debt, resulting in a deficiency, the bank would have to make up the deficiency. In other words, the amount of the debt measures the liability of the bank, and there are no such contingencies as are involved in the sale of investment securities. The repurchase agreement is simply in support of the obligation. Furthermore, even if this were not true, we discover nothing in the cases or in principle to warrant a conclusion that a repurchase agreement given in support of collateral deposited to secure a debt is so illegal in quality as to invalidate the whole transaction including the debt. Hence, while we do not doubt the soundness of the cases cited, we think them inapplicable in the present situation. National is not attempting here to enforce a repurchase agreement by Liberty. It may be added that the fact that all loans have been fully paid by the liquidation of securities would seem in any event to put them beyond attack by those who rely upon the assumed invalidity of the repurchase agreements.

The next contention is that the resolutions adopted by the board of directors of Liberty were not sufficient to vest authority in the officers of Liberty to make the loans. Assuming, without deciding, that the facts are as appellants claim them to be, this contention must be rejected under the doctrine of *Aldrich v. Chemical National Bank,* 176 U. S. 618,

636, 20 Sup. Ct. 498, 44 L. Ed. 611, in which it was held that the plea that a bank's officers had no authority or that the bank itself had no authority to make a loan would not constitute a good defense if the bank actually received the money and used it in the normal course of its business. The court stated that there is "nothing in the acts of congress authorizing or permitting a national bank to appropriate and use the money or property of others for its benefit without liability for so doing." To the same effect see *Hardy v. People's State Bank*, 185 Wis. 446, 201 N. W. 725. See also *Hunter v. Barronett State Bank*, 203 Wis. 576, 234 N. W. 746, where it was held that although a bank may not lend its credit as an accommodation indorser, if it guarantees its debtor's note and receives the proceeds in payment of his paper, it cannot plead want of authority or *ultra vires*.

In *Gilmore v. Roberts*, 79 Wis. 450, 454, 48 N. W. 522, where securities were drawn payable not to the lender but to a third person in order to avoid payment of taxes by the lender, the defense of illegality would not be entertained. It was said that "the mere purpose of taking the notes and mortgage in a form better calculated to enable the plaintiff thereafter to escape taxation thereon" did not render the transaction illegal or void. Hence, it appears to us that since National concededly loaned $583,300 which is unpaid and which was used in the business of Liberty, Liberty is not in a position to assert that there was a want of authority in its officers to enter into the transactions in question. It is argued that since this transaction discharged portions of the debt validly contracted and that later new notes were given requires a conclusion that the new notes evidence the debt and that no actual money was ever advanced upon these notes. This is a sacrifice of substance to form. No matter how this matter is set up, there is no escape from the fact that Liberty had and used and has not paid for the precise amount claimed by National, and the doctrine of the cases considered would require restitution by Liberty.

The next contention of appellants is that failure of National to apply to the banking review board for a review of the commission's action rejecting its claim bars its recovery here. This is based on the fact that National's claim was rejected by the commission on July 19, 1935, and that instead of asking for review by the banking review board, National instituted action in the circuit court upon its claim. The commission contends that since the enactment of secs. 220.02 (5) and 220.035 (2), Stats., it was a condition precedent to any appeal to the courts that National, within ten days after the rejection of its claim, apply to the banking review board to review the action of the commission. National acted under the provisions of sec. 220.08 (5), Stats. 1935. This subsection was enacted by ch. 396, Laws of 1909, and so far as material here provides:

"If the commissioner doubts the justice and validity of any claim, he may reject the same, and serve notice of such rejection upon the claimant either by mail or personally. An affidavit of the service of such notice, which shall be *prima facie* evidence thereof, shall be filed with the commissioner. An action upon a claim so rejected must be brought within six months after such service."

Ch. 10, Laws of Sp. Sess. 1931–32, created the banking review board and also sec. 220.035, Stats., sub. (2) of which, so far as material, reads as follows:

"The duties of the board shall be to advise with the commissioner of banking and others in respect to improvement in the condition and service of banks and banking business in this state and to review the acts and decisions of the banking commissioner and to perform such other review functions in relation to banking as may be provided by law."

By sec. 3, ch. 7, Laws of 1933, sec. 220.02 (5), Stats., was enacted. This subsection provides:

"Any interested person or any bank or banking corporation aggrieved by any act, order or determination of the banking commissioner may, within ten days from the date of

such act, order or determination, apply to the banking review board to review the action of the commissioner. All such applications for review shall be considered and disposed of as speedily as possible. The banking review board may require the commissioner of banking to submit any of his official actions to said board for its approval."

It is the contention of appellants that a special tribunal having been created, charged with the duty and vested with the power of review, there must be an application for review by this tribunal before resort may be had to the courts. It is contended that this is the effect of the holding in *Corstvet v. Bank of Deerfield,* 220 Wis. 209, 263 N. W. 687. In that case the action was by Corstvet against the Bank of Deerfield to recover upon twenty-one certificates of deposit issued to plaintiff by defendant. The defense was a stabilization agreement in November, 1932. It appeared that the bank had been reorganized under the provisions of sec. 220.08 (15), Stats. One of the questions involved was whether the stabilization readjustment agreement conformed to the requirements of the statute. This had been determined favorably to the validity of the agreement by the commissioner of banking. No effort was made to have this determination reviewed by the banking review board. It was held that the failure of the plaintiff to invoke the powers of the banking review board concluded him upon this point and precluded his appeal to the court. This was put upon the familiar and well-established ground that when a statute creates a special tribunal to review determinations of administrative bodies that remedy is exclusive in the sense that it must be fully exhausted before resort is had to action in the courts.

We conclude that appellants' position cannot be sustained. To sustain it would completely deprive sec. 220.08 (5), Stats., of meaning, and this cannot have been the legislative intention. Since the enactment of secs. 220.02 (5) and 220.035 (2) the legislature has re-enacted sub. (5) of sec. 220.08 in precisely the form in which it had theretofore ex-

isted in the statutes, and the conclusion seems to us to be inevitable that the review of claims is specifically governed by sub. (5) of sec. 220.08 and not by sec. 220.02 (5). The latter section does operate as claimed by appellants to situations other than rejected claims. One of these situations was dealt with in the *Corstvet Case, supra.* Apart from this, it is difficult to see how this contention advances appellants' position. In the period after the closing of Liberty, National, with the full consent of the commissioner and commission, fully liquidated the securities and applied them to the satisfaction of its claim against Liberty. In view of this, it is to be doubted whether the commission had any jurisdiction to revoke its approval or allowance of the claim and to reject it several years later. However that may be, National's claim has been fully paid and the statutes contain no method by which the commission could upset this transaction and restore the proceeds of the collateral to Liberty other than by an appeal to the courts. This the commission has done, and in doing so it has necessarily raised all of the questions that have been here litigated. Thus, it seems to us that however this problem is viewed, the conclusions of the trial court upon this point must be sustained.

It is next claimed that at all events the commission was entitled to possession of all collateral held by National in excess of the amount authorized by statute to secure legal and valid obligations, and that at the time of the close of Liberty, National held assets of Liberty in excess of the amount which it could lawfully hold as security for the payment of this claim. This contention depends in part upon the proper construction of sec. 221.33, Stats., which provides:

"No bank or bank officer shall give preference to any depositor or creditor by pledging the assets of the bank as collateral security; . . . and provided, that any bank may borrow money for temporary purposes, and may pledge assets of the bank not exceeding fifty per cent in excess of the amount borrowed as collateral security therefor. . . ."

It is appellants' position that the phrase "not exceeding fifty per cent in excess of the amount borrowed" refers to the face value of the collateral and not to its actual value. At the time Liberty closed it owed $583,300 and this was collateralized by securities of the face value of $1,136,773.55. Applied to this case, appellants' construction would mean that National was only permitted to hold collateral of a face value of $874,950, and that it actually held in excess of this amount security of the face value of $251,823.55. The trial court correctly held that the statute refers to the actual and not the face value of collateral security. This accords with the sense normally attributable to the words used, as well as to the practical construction of the section by the Banking Commission and the opinion of the attorney general. It is extremely unlikely that the legislature, in authorizing the pledging of assets to support loans for temporary purposes, had any intent to apply the percentage to face values of securities. This type of transaction is a species of emergency borrowing and in that situation the probability is that the borrowing bank is short of liquid assets readily discountable at par. If appellants' construction is adopted, banks will be virtually unable to take any advantage of the statute in the very situation in which it is important to exercise the power for the reason that the lending bank will not find itself sufficiently secured by collateral, the face value of which does not exceed one hundred fifty per cent of the loan, and will therefore decline the loan.

It is finally claimed that the trial court erred in allowing interest on the claim of National subsequent to July 18, 1932, the date Liberty closed. Appellants contend that the applicable rule is that interest is not allowable on secured or unsecured debts due from an insolvent bank accruing subsequent to insolvency unless and until all creditors have been paid the full amount of their claims with interest to the date of insolvency. *Gamble v. Wimberly* (4th Cir.), 44 Fed. (2d)

329; *White v. Knox,* 111 U. S. 784, 4 Sup. Ct. 686, 28 L. Ed. 603. The rule asserted by these authorities is not applicable to the present situation. These cases involve creditors, secured or unsecured, who seek to have interest allowed out of the general estate held for distribution to the creditors. As pointed out in *Ticonic National Bank v. Sprague,* 303 U. S. 406, 413, 58 Sup. Ct. 612, 82 L. Ed. 926:

"As the obligation to pay interest is not destroyed by the insolvency and as the rights of the secured creditor in his collateral, contractual or statutory, are likewise unaffected, we are of the opinion that a secured creditor of a national bank in receivership may enforce his lien against his security, where it is sufficient to cover both principal and interest, until his claim for both is satisfied."

In *Thomsen v. Cullen,* 196 Wis. 581, 593, 219 N. W. 439, the court said:

"Where a person has during his lifetime pledged certain assets belonging to him to secure the payment of a sum with interest, we find no case and have been cited to none where it is held that against an insolvent estate the pledgee is not entitled to receive the amount stipulated in the contract, including interest."

Appellants seek to limit the scope of the decision in the *Ticonic National Bank Case, supra,* by a construction of the following statement by the court (p. 412):

"By contract or, as in this case, by statute, the secured creditors gain or are given a lien on or right in property 'in addition to their claim against the estate of the bank.' Section 11 (k) of the Federal Reserve Act as amended."

It is claimed that there is no statutory provision in this state giving a lien to National. This overlooks the alternative stated by the court. National had a lien upon the pledged collateral by contract and the rule of that case plainly applies. It is further stated in the *Ticonic Case, supra,* that the "lien prior to receivership withdrew the pledged security from the assets of the bank available to general creditors, in so far as

might be necessary to satisfy the lien. . . . It was subject to this lien and to that extent the property pledged could not properly be said to belong to the bank for purposes of distribution to creditors."

It follows from what has heretofore been said that the judgment of the trial court must be affirmed.

We do not deem it necessary to extend this opinion by giving consideration to the question whether the voluntary payment of National's claim with the assent of the circuit court, creditors' committee, and the commission was made under such circumstances as to constitute a complete bar to appellants' contentions that the loans were illegal or the collateral unlawfully pledged. Nor do we find it necessary to consider respondent's contention that such arrangements and agreements as are charged by appellants to National and its officers would be *ultra vires* as to National.

In closing the opinion in this complicated and difficult case, the court acknowledges the very great assistance given to the court by counsel for all the parties and the able, lawyerlike briefs by which the contentions on both sides have been advanced.

*By the Court.*—Judgment affirmed.